**CHASAN & WALTON, LLC**
ANDREW M. CHASAN, ISB #2100
E-mail: andrew.chasan@chasanwalton.com
TIMOTHY C. WALTON, ISB #2170
E-mail: timwalton2000@hotmail.com
P.O. Box 1069
Boise, Idaho 83701
Phone: 208-345-3760
Fax: 208-345-0288

**DUMAS & VAUGHN, LLC**
GILION C. DUMAS, ISB #8176
E-mail: gilion@dumasandvaughn.com
3835 NE Hancock St., Ste. GL-B
Portland, OR 97212
Phone: 503-616-5007
Fax: 888-396-3226
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| Mark Doe 6, an individual proceeding under pseudonym,<br><br>Plaintiff,<br><br>v.<br><br>IDAHO STATE ELKS ASSOCIATION, INC.,<br><br>Defendant. | Case No.<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br>*Fraud and Constructive Fraud*<br><br>**Jury trial demanded** |

COMES NOW the above-named Plaintiff, by and through his attorneys of record, and for causes of action against the above-named Defendant, alleges as follows:

**COMPANION CASE**

1.

This Complaint should be read in conjunction with the allegations in *Mark Doe 1, et al. v. Mountain West Council, Inc., Boy Scouts of America, et al.*, U.S. District Court No. 1:20-cv-

**COMPLAINT - 1**

00497-BLW (Id. Dist.), the Second Amended Complaint attached as Exhibit 1. Plaintiff is identified as "Mark Doe 6" in the aforementioned case, and alleges causes of action for fraud and constructive fraud against the Inland Northwest Council of Boy Scouts of America ("Inland NW Council") ("BSA"), for child abuse arising from the same operative facts as alleged in this complaint. Pursuant to the "Notice of Entry of Fourth Stipulated Order Modifying BSA's Motion for Preliminary Injunction and Further Extending the Termination Dates of the Standstill Period" (Dkt. No. 19) ("Fourth Stipulation") filed in the aforementioned case and originally entered in the Boy Scouts of America's bankruptcy proceeding (Adv. Proc. Case No. 20-50527 (LSS) (Bankr. D. Del.)), the aforementioned case is stayed until July 19, 2021.

## IDENTITY OF THE PARTIES

2.

Plaintiff's true name is not stated in this Complaint to protect him from further emotional harm and to protect his privacy because this Complaint alleges intimate details of child sexual abuse. His true name will be provided to Defendant and the Court as may be required by law.

3.

Plaintiff Mark Doe 6 is an adult male resident of Washington. At all relevant times he was a resident of Idaho. He was born in 1957.

4.

At all times relevant to this Complaint, Defendant Idaho State Elks Association, Inc. ("Defendant Elks Association") was an Idaho nonprofit corporation with its principal place of business in Ponderay, Idaho. Defendant Elks Association owned, managed, controlled, and/or operated the premises and activities of Lewiston Elks Lodge #896 a/k/a Benevolent and Protective Order of the Elks Lodge #896, including but not limited to sponsoring Boy Scout

**COMPLAINT - 2**

Troop 156. Defendant was an actual or apparent agent of the Inland NW Council and BSA in operating and sponsoring Troop 156.

## JURISDICTION AND VENUE

5.

This Court has jurisdiction over Plaintiff's claims under 28 U.S. Code § 1334(b) because this case arises in or is related to *In re: Boy Scouts of America and Delaware BSA, LLC,* U.S. Bk. Ct. (Delaware Dist.) No. 20-10343 and *Boy Scouts of America v. A.A., et al.,* U.S. Bk. Ct. (Delaware Dist.) No. 20-50527 ("BSA's Chapter 11 bankruptcy case") for at least the following reasons:

    a.    Plaintiff asserts claims to recover monetary damages based upon tortious actions or omissions committed by BSA agents or otherwise related parties;

    b.    BSA and the non-debtor Defendant named in this case share an identity of interest such that a claim against this Defendant may be, in effect, a claim against BSA's estate;

    c.    On information and belief, BSA and non-debtor Defendant, in many instances, are parties to shared insurance;

    d.    The claims and allegations against non-debtor Defendant are inextricably intertwined with the claims and allegations asserted against BSA in its bankruptcy such that the case is "related to" BSA's Chapter 11 case. The claims and allegations arise out of a common nucleus of operative facts and raise substantially similar questions of law; and

    e.    Various Elks Lodge associations are named as "BSA Related Parties" in the Fourth Stipulation in BSA's Chapter 11 bankruptcy case, Dkt. 19-1 (March 24, 2021).

/ / /

/ / /

**COMPLAINT - 3**

6.

Venue is proper in this judicial district under 28 U.S. Code § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred here.

## ORGANIZATION OF SCOUTING

7.

Defendant, along with BSA and various local councils, including the Inland NW Council, invited boys, including Plaintiff, to participate in Scouting, including Scouting activities such as camping and hiking trips.

8.

BSA was and is a vertically-integrated organization. The national BSA organization was at the top of the structure. BSA national established goals, standards, and rules for leaders at the lower levels to follow, and BSA national relied upon local employees and volunteers to implement its goals, standards, and rules. The lower levels of BSA included sponsoring organizations (like Defendant Elks), local councils (like the Inland NW Council), troop committees, and troops.

9.

Local councils, generally at the state or regional level, such as the Inland NW Council, jointly administered and controlled, with BSA, the Scouting program at the state/regional level.

10.

Local councils and BSA organized Scouting into "troops" at the local level. Local councils and BSA operated all troops relevant to Plaintiff's allegations in Idaho. These troops were officially sanctioned BSA troops that participated in activities such as group meetings, camping, hiking, and earning "Merit Badges."

COMPLAINT - 4

11.

Organizations, such as churches, schools, and other nonprofit organizations, including Defendant Elks Association, "sponsored" or "chartered" local Scout troops by assisting with selecting adult Scout leaders for the troops, supervising those adult Scout leaders, providing meeting locations for the troops, creating additional rules applicable to the troops, ensuring that BSA's and the local councils' rules and guidelines were followed, and providing additional support and resources for the troops.

12.

Defendant Elks Association, the Inland NW Council, and BSA selected and approved Lawrence Libey as an adult Scout volunteer for Troop 156 in Lewiston, Idaho. At all relevant times, Libey was an actual or apparent agent of Defendant Elks Association, the Inland NW Council, and BSA.

13.

Defendant, the Inland NW Council, and BSA authorized and empowered Libey to perform all the duties of troop leaders, including but not limited to providing instruction, counseling, and physical supervision of Scouts; educating Scouts in morality, patriotism, character-building, obedience, and various other life skills; mentoring and befriending Scouts; and enforcing rules governing Scouts' participation in Scouting. Defendant, the Inland NW Council, and BSA knew that, as part of his duties and expectations as troop leaders, Libey would be in a position of trust, confidence, respect, and authority over Scouts, including Plaintiff.

14.

Defendant, the Inland NW Council, and BSA retained the right to control, and had actual and apparent control of the means, methods, and physical details of troop leaders'

performance of the duties described above.  As part of his duties as a troop leader, Libey used his position to gain the trust and confidence of Plaintiff to spend large periods of time alone with Plaintiff, or with Plaintiff and other Scouts, with no other adults supervising.  Libey performed his duties as a troop leader in connection with his agency relationship with Defendant, the Inland NW Council, and BSA, and his duties generally were of a kind and nature that Scout volunteers were required to perform as troop leaders.

## HISTORY OF SEXUAL ABUSE IN SCOUTING

15.

Beginning as early as the 1910s, BSA regularly received reports and information from its local Councils and agents of adult Scouting volunteers and employees sexually abusing Scouts.  Based on these reports, BSA created a file system now known as the "Ineligible Volunteer" files ("IV files") or "Volunteer Screening" files to attempt to track a variety of transgressions by adult volunteers, including volunteers that sexually abused Scouts.  BSA categorized IV files according to the type of transgression committed, labeling IV files that contained allegations of child sexual abuse as "Perversion" files.  The IV Files generally contain detailed factual information about the circumstances under which child sexual abuse occurred in Scouting.  The number of IV Perversion files that still exists significantly underrepresents the actual number of IV Perversion files and of adult Scout leaders that molested Scouts for many reasons, including that BSA destroyed many of the IV files created before Plaintiff was abused, and because many children did not report their sexual abuse.  These IV Files were regularly utilized by local councils.

/ / /

/ / /

COMPLAINT - 6

16.

The earliest existing IV File from Idaho is from Lewiston, Idaho in 1962.  The next existing IV File from Idaho is for one of the repeat perpetrators named in this case, Robert F. Elliott, from 1971, even though the IV File indicates Mountain West Council knew of Elliott's dangerousness to Scouts by 1969.  Several other IV Files exist from the 1970s and early 1980s describing child sexual abuse occurring in Scouting in Idaho, based on information received from Idaho local councils.  Based on the information in the IV Files, Idaho local councils and BSA knew that child molesters were using Scouting to gain access to and gain the trust of Scouts, including Plaintiff, in order to molest them.

17.

Defendant Elks Association, the Inland NW Council, and BSA also had specific knowledge by 1968 or 1969 of perpetrator Lawrence Libey's sexual dangerousness to Scouts. Libey was the Assistant Scoutmaster for Troop 156 in Lewiston, Idaho in or around 1968 or 1969.  Within a short time after Libey became the Assistant Scoutmaster, the troop went on a camping trip.  Libey had a minor Scout sleep in his tent with him, alone.  The Scoutmaster of Troop 156 at the time did not approve and reported the incident to agents of Defendant Elks Association.  On information and belief, these agents were also members of the Troop Committee for Troop 156.  The Scoutmaster testified that he believed the agents he reported the incident to had authority to make leadership decisions regarding troop volunteers, that they were his "boss," and that they comprised a "council" of the local Elks Lodge sponsor.   The committee and agents of Defendant Elks Association chose Libey to lead the troop instead of the reporting Scoutmaster.  Libey then became the sole Scoutmaster of Troop 156.

/ / /

**COMPLAINT - 7**

18.

Additionally, in 1969 or 1970, a group of Scouts' fathers from Troop 156 met with Philip Weisberger, who was Troop Committee Chairman and Institutional Representative for the local Elks Lodge sponsor and, therefore, Weisberger was an agent of Defendant Elks Association. On information and belief, during this meeting, these fathers raised concerns regarding Libey acting sexually inappropriately with Scouts. Weisberger was acting as an agent of Defendant Elks Association, the Inland NW Council, and BSA when he received that information regarding Libey's inappropriate conduct with Scouts.

19.

The Mountain West Council and BSA had specific knowledge by 1969 of perpetrator Robert Elliott's sexual dangerousness to Scouts. According to BSA's own IV File on Elliott, created in 1971, Elliott served in the Air Force, and Air Force officers warned the District Scout Executive in 1969 that Elliott should not be allowed to associate with the Boy Scouts of America. The Mountain West Council admitted taking "no action." The Mountain West Council continued receiving reports on "numerous occasions" about Elliott's "unorthodox or strange behavior" throughout 1970. Although the Mountain West Council supposedly tried to keep him away from "boy programs," the Mountain West Council did not remove him from Scouting or report him to law enforcement. The Mountain West Council continued to receive reports about "very questionable situations involving Scouts" through 1971 until the Mountain West Council and BSA finally removed him from Scouting.

20.

The Mountain West Council, the Church of Jesus Christ of Latter-Day Saints, and BSA also had specific knowledge by at least 1964 of perpetrator Larren Arnold's sexual

**COMPLAINT - 8**

dangerousness to Scouts. An adult member of the Nampa Second Ward told Bishop Leon Hales that his son, a Scout in Troop 101, had been molested by Arnold, his Scoutmaster. Bishop Hales responded that he would "take care of it." A week later, Bishop Hale told the father that he had taken care of it. Hales was a member of the Ore–Ida Council (now Mountain West Council) and BSA when this conversation took place. Additionally, between 1971 and 1973, Arnold sexually abused another Scout in Troop 101. At the time, the Scout reported his abuse to Bishop Elvin Hegstrom, Bishop of the Nampa Second Ward.

21.

The Mountain West Council, the Church of Jesus Christ of Latter-Day Saints, and BSA also had specific knowledge by the early 1980s that Jon Roundy was sexually dangerous to boys and should not be a Scout leader. A minor Scout was abused by Jon Roundy in approximately 1980/1981-1982/1983, as alleged in the *Mark Doe 1* case, described in paragraph 1. During the course of his abuse, he reported the abuse to Bishop Daron Critchfield of the Second Ward in Oakley, Idaho. To his knowledge, Bishop Critchfield took no remedial action. Roundy continued to volunteer with Scouting and abuse the Scout after he reported his abuse to Bishop Critchfield.

22.

 By the time Plaintiff joined Scouting, based on the incident reports in the IV Files generated by BSA's and local councils' volunteers, employees, and agents, as described above, as well as the allegations against Libey, Elliott, Arnold, and Roundy, Idaho's local councils, charter organizations including Defendant, and BSA knew that Scouting posed a danger to minor boys because there had been a longstanding, consistent, and widespread problem with adult volunteers sexually abusing Scouts. Prior to Plaintiff's abuse, Idaho's local councils, charter

**COMPLAINT - 9**

organizations including Defendant, and BSA knew that at least a significant number of Scouts would be sexually abused by Scout leaders every year if Scouting remained structured as it was.

## DEFENDANT'S FRAUD

23.

Defendant, local councils, and BSA invited boys, including Plaintiff, to participate in Scouting and enter into a commercial relationship, which included Scouts paying an annual membership fee and other fees, and making required purchases, in exchange for participating in Scouting. Defendant, local councils, and BSA also created a relationship of trust and confidence with Plaintiff by inviting him to participate in Scouting and acting *in loco parentis* to Plaintiff during Scouting activities such as camping and hiking trips. Defendant, local councils, and BSA undertook responsibility for the safety of Scouts such as Plaintiff and delegated that responsibility to Scout volunteers acting under Defendant's, local councils', and BSA's control.

24.

Prior to and during Plaintiff's abuse, Defendant, local councils, and BSA actively concealed their knowledge that abusers had been joining Scouting for decades to gain access to and sexually abuse boys. When BSA added a volunteer to the IV File list for sexually abusing boys, BSA routinely instructed the Scout Executives of local councils, like the Inland NW Council, and other local employees and volunteers to keep secret the reason the volunteer had been dismissed and the existence of the IV Perversion file system. Many times, BSA then deleted, or instructed local employees or volunteers to delete, the volunteer's name from unit applications and rosters. BSA also had a policy of limiting the use of the IV File system to a limited number of employees at the BSA national office and certain local employees and volunteers. BSA had no policies requiring or encouraging its employees to disclose the

existence or functioning of the IV File system to the Scouting community and the general public, thereby limiting the use of the IV File system to report allegations of wrongdoing by adult Scout volunteers. Local councils, despite knowing of the IV File system and BSA's lack of policies and transparency, also had no policies requiring or encouraging local employees and volunteers to disclose the existence or functioning of the IV File system.

25.

Defendant, local councils, and BSA also actively concealed their knowledge that Scout leaders in Idaho, including Libey, had been accused of acting sexually inappropriately with Scouts or other boys prior to Plaintiff's abuse.

26.

Prior to and during Plaintiff's abuse, Defendant, local councils, and BSA engaged in a decades-long public relations campaign to represent to the government, the public, and the Scouting community, including Plaintiff and his families, that Scouting was a safe and morally upright program that was physically, emotionally, and spiritually beneficial for boys. Defendant, local councils, and BSA additionally represented that the adult Scout leaders, who were their agents, were appropriate and trustworthy mentors and leaders for young boys.

27.

Prior to and during Plaintiff's abuse, Defendant, local councils, and BSA conveyed the misrepresentation that adult Scout leaders were appropriate and trustworthy mentors and leaders by selecting, approving, and retaining certain men as adult Scout volunteers. Defendant, local councils, and BSA further conveyed the misrepresentation that Scouting was a safe and morally upright program for boys by failing to enact or enforce common sense child abuse policies,

/ / /

**COMPLAINT - 11**

acknowledge the existence of child sexual abuse in Scouting, or otherwise amend the Scouting program to reduce the prevalence of child sexual abuse in Scouting.

28.

Prior to and during Plaintiff's abuse, BSA also conveyed the aforementioned misrepresentations through explicit language, such as in newspaper, magazine, radio, and television advertisements; news articles and other media spots; BSA-published publications; and annual reports to Congress. As examples, BSA made specific statements in various editions of the *Boy Scout Handbook*, such as the Scout Oath and Scout Law. In the 1965–1972 *Boy Scout Handbook*, the Scoutmaster is referred to as "a wonderful man" who goes on hikes and goes camping with the Troop, and who "is the friend to whom you can always turn for advice." BSA, *Boy Scout Handbook*, at 94 (7th ed., 3rd printing, 1967). The 1972-1978 *Boy Scout Handbook*, BSA stated, "[o]ver there watching things is your Scoutmaster. He's a great guy. He gives hours of his time to you and the troop. And do you know why? Mostly because he knows Scouting is important to his city and nation. Besides, he is interested in boys." BSA, *Boy Scout Handbook*, at 9 (8th ed., 2nd printing, 1973). This edition also told Scouts: "Your Scoutmaster is interested in and wants to know about you. Only then can he help you to have fun in Scouting. [Y]our Scoutmaster wants to know you better. He wants to see what you have to bring to the troop. Soon after joining you will have your first personal growth agreement conference. Here you and your Scoutmaster will sit down for a talk. Tell him about yourself. Your Scoutmaster will probably ask about the things you like to do. Your Scoutmaster will also want to know what things you do well." *Id*. at 82-83. This partial list of explicit misrepresentations is not exhaustive.

/ / /

**COMPLAINT - 12**

29.

Defendant and local councils utilized BSA's promotion materials, handbooks, and other documents, thus adopting BSA's explicit misrepresentations as their own.

30.

Prior to and during Plaintiff's abuse, Defendant, local councils, and BSA also conveyed the aforementioned misrepresentations through silence because they never warned the Scouting community, including Plaintiff, his parents, and the general public that adult Scout volunteers were not always safe and trustworthy, that they might make sexual advances, or that significant numbers of them had abused boys in the past. This partial list of omissions is not exclusive.

31.

Defendant, local councils, and BSA made these misrepresentations with the intent of inducing Plaintiff (and other children similarly situated), Plaintiff's parents (and other parents and guardians similarly situated), and the public to rely on Defendant's, local councils', and BSA's misrepresentations so that they would continue to trust Scouting and adult Scout volunteers, and continue to participate in Scouting. Defendant, local councils, and BSA also made the misrepresentations with the intent of shielding Scouting from scrutiny to ensure that children continued to join, to benefit Defendant's, local councils', and BSA's financial positions and reputations.

32.

Defendant, the Inland NW Council, and BSA knew the representations about Scouting, Scout leaders in general, and Libey specifically, were false, or made the misrepresentations with reckless disregard for the truth.

/ / /

**COMPLAINT - 13**

33.

Defendant, the Inland NW Council, and BSA's knowledge of the dangers and prevalence of child sexual abusers in Scouting and specific knowledge of the sexual impropriety accusations against Libey constituted a material fact. Had Plaintiff and his parents been aware of such dangers, Plaintiff would not have entered into a relationship, or would not have continued a relationship, with Defendant and Scouting, or would have taken steps to protect himself from being abused while in Scouting.

34.

Plaintiff and his parents justifiably and reasonably relied on Defendant's, the Inland NW Council's, and BSA's misrepresentations by allowing Plaintiff to join Scouting, remain in Scouting, and engage in a trust relationship with Libey. Their reliance was justified because Plaintiff and his parents could not investigate Defendant's, the Inland NW Council's, and BSA's claims that Scout volunteers were safe and trustworthy, given that the records that would disprove the fraud — *e.g.* BSA's IV files — were not available to the public until decades later; and Plaintiff and his parents did not know of Defendant's, the Inland NW Council's, and BSA's knowledge of Libey and other abusers.

**PLAINTIFF'S ABUSE**

35.

Plaintiff Mark Doe 6 realleges and incorporates by reference all preceding paragraphs as if alleged herein.

/ / /

/ / /

/ / /

**COMPLAINT - 14**

36.

At all relevant times, Plaintiff Mark Doe 6 was a member of Boy Scout Troop 156 in Lewiston, Idaho, and was under the care, custody, protection, and/or responsibility of Defendant Elks Association, the Inland NW Council, and BSA.

37.

When Plaintiff Mark Doe 6 was approximately 12 years old, in or around 1969, he was a member of Troop 156. Lawrence Libey was the Scoutmaster and/or Assistant Scoutmaster of Troop 156. Libey sexually abused Plaintiff for approximately two years, from 1969 to 1971, on approximately twelve separate occasions. The abuse included fondling, oral rape, and Libey anally raping Plaintiff, and occurred at Libey's trailer home, the Presbyterian Church, and Camp Grizzly, following or in conjunction with Scouting meetings and camping trips.

38.

As a direct and proximate result of Defendant's oppressive, fraudulent, malicious, and/or outrageous conduct as described above and as defined in Idaho Code § 6-1604, Plaintiff Mark Doe 6 was seriously injured, and such injuries prevail and will continue to prevail for an indefinite time into the future. The injuries include but are not limited to physical and emotional pain and suffering, mental anguish, and disability, and are permanent, progressive, and disabling. His damages include general damages and such other damages as are shown by the evidence, to be proved at the time of trial, in an amount now unknown.

39.

Within the past three years Plaintiff discovered and continues to discover that, throughout the time he was involved in the Scouting program, Defendant perpetrated a fraud related to the dangers of Scout leaders sexually abusing children in the Scouting program. Prior to Plaintiff's

**COMPLAINT - 15**

discovery of Defendant's fraud, Plaintiff did not know and could not know that Defendant's misrepresentations, or lack thereof, regarding the trustworthiness of Scout leaders and Libey, and the safety of the Scouting program were false, and that Defendant knew the Scouting program was structured in such a way that sexual abuse of Scouts by Scout leaders was certain to occur to some degree within the Scouting program.

**FIRST CLAIM FOR RELIEF**
*Fraud*

40.

Plaintiff realleges and incorporates by reference all preceding paragraphs as if alleged herein.

41.

As alleged above, Defendant Elks Association committed fraud by active concealment.

42.

As alleged above, Defendant committed fraud by conduct and through explicit language.

43.

As alleged above, Defendant had a duty to disclose to Plaintiff its knowledge of the sexual abuse history in Scouting and the risk that Scouts such as Plaintiff could be sexually abused by their Scout leaders.

44.

As alleged above, Defendant committed fraud through nondisclosure.

45.

As a direct result and consequence of Defendant's fraud, Plaintiff suffered the injuries and incurred the damages described above.

/ / /

**COMPLAINT - 16**

## SECOND CLAIM FOR RELIEF
### *Constructive Fraud*

46.

Plaintiff realleges and incorporates by reference all preceding paragraphs as if alleged herein.

47.

As alleged above, Defendant committed constructive fraud.

48.

As a direct result and consequence of Defendant's constructive fraud, Plaintiff suffered the injuries and incurred the damages described above.

**WHEREFORE**, Plaintiff prays for judgment as follows:

1. Non-economic damages and such other damages as are shown by the evidence by Defendant, the exact amounts to be determined by the jury at the time of trial;

2. For Plaintiff's disbursements and incurred costs;

3. Attorney fees; and

4. For any other relief, this Court deems just and equitable.

**PLAINTIFF DEMANDS A TRIAL BY JURY.**

DATED this 3rd day of June, 2021.

*/s/ Gilion C. Dumas*
Gilion C. Dumas, ISB #8176
**DUMAS & VAUGHN, LLC**

Andrew M. Chasan, ISB #2100
Timothy C. Walton, ISB #2170
**CHASAN & WALTON, LLC**

*Attorneys for Plaintiff*

**COMPLAINT - 17**